UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DIANA FINCH, on behalf of herself and all others similarly situated, )<br><br>Plaintiff, )<br><br>v. )<br><br>XANDR, INC., )<br><br>Defendant. ) | **CLASS ACTION COMPLAINT**<br>**Jury Trial Demanded** |

Plaintiff Diana Finch, individually, and on behalf of all others similarly situated, brings this Class Complaint against Defendant Xandr, Inc. ("Xandr") and alleges the following, based upon personal knowledge as to her own acts and based upon information and belief as to all others:

## INTRODUCTION

1.    Xandr is a digital advertising technology company that develops online software and strategies for the digital publishing and advertising industry aimed at reaching target audiences across advertising formats and devices through the use and dissemination of personal data.

2.    The General Data Protection Regulation in force in the United Kingdom at the time of this Complaint ("UK GDPR") requires businesses to protect the personal data and privacy of natural persons.

3.    The principles of lawfulness, transparency, and accountability are fundamental conditions for processing personal data under the UK GDPR.

4.   Xandr creates and places unique identifiers in the form of cookie IDs on internet users' devices which allow it to read and share personal data from that user.

5.   These cookie IDs and the data that they allow Xandr to collect constitute personal data protected by the UK GDPR.

6.   Pursuant to the UK GDPR, in order to perform the activities that Xandr is performing, it must have a lawful basis, generally through consent of the data subject.

7.   Any consent obtained from data subjects is inadequate because it is either non-existent or not compliant with the UK GDPR.

8.   Xandr cannot rely on its legitimate interest in processing personal data, as such reliance is precluded by both the UK GDPR and regulatory authorities. However, even if it were not precluded as a matter of law, the balance of interests required to be undertaken by Xandr in order to rely on this basis of lawful processing does not support Xandr's processing of personal data.

9.   As such, Xandr lacks a lawful basis for processing personal data.

10.   Xandr's processing of personal data without a lawful basis via the action of creating and reading unique cookie IDs and the collection of associated browser-generated information constitutes intrusive, extensive, and unexpected loss of control of the users' personal data in violation of the UK GDPR.

11.   Xandr also lacks transparency due to the inadequate or non-existent communication with users, defined under the UK GDPR as "data subjects", in violation of Articles 5(1)(a) and Articles 13-14 of the UK GDPR.

12.   Plaintiff Diana Finch is a victim of Xandr's blatant disregard for the privacy rights set forth in the UK GDPR.

13.   Ms. Finch suffered a concrete and particularized injury of loss of control of her personal data through Xandr's actions complained of herein.

14.     Ms. Finch files this action to recover the damages she, as well as thousands of other residents of the United Kingdom, have incurred from Xandr's wrongful conduct and to stop Xandr's unlawful practices of gathering, processing, and disseminating users' personal data without proper consent.

## PARTIES

15.     Ms. Diana Finch is a citizen of Kingswood, Bristol, United Kingdom.

16.     Ms. Finch is a "data subject" as that term is defined in Article 4(1) of the UK GDPR.

17.     Xandr is a wholly owned subsidiary of AT&T Inc. and is incorporated under the laws of the State Delaware.

18.     Xandr's principal place of business is in New York, New York.

19.     Xandr was and is a "controller" as defined in Article 4(7) of the UK GDPR.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over Ms. Finch's claims pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act. The amount in controversy exceeds $5,000,000, exclusive of attorneys' fees, pre-judgment interest, and costs, there are members of the proposed Class who are citizens or subjects of a foreign state, and Xandr is a citizen of New York.

21.     This Court also has subject matter jurisdiction over Ms. Finch's claims pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and because complete diversity exists as Xandr is a citizen of New York while Ms. Finch and the putative class members are domiciled in the United Kingdom.

22.     This Court may exercise personal jurisdiction over Xandr because Xandr conducts substantial business in this State and within the Southern District of New York and receives substantial compensation and profits from the activities it undertakes in this District.

23.    Venue is proper in this District under 28 U.S.C. § 1391(a), as Xandr resides in this District and under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

24.    New York is the most convenient forum for this litigation, as Xandr specifically submitted to the exclusive jurisdiction of federal and state courts located in the State of New York.[1]

25.    The United Kingdom is not the proper jurisdiction because Xandr has never purposefully subjected itself to personal jurisdiction in the United Kingdom.

## LEGAL FRAMEWORK

### Request for Application of Foreign Law

26.    Ms. Finch and the Class Members plead foreign law in accordance with Federal Rule of Civil Procedure 44.1, which provides:

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

27.    The General Data Protection Regulation was originally passed on April 14, 2016 and went into effect on May 25, 2018, within the European Union ("EU GDPR").

28.    The Data Protection Act 2018, is the UK's implementation of the EU GDPR.

---

[1] *See* https://www.xandr.com/legal/ ("These Terms shall be governed and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed in New York. You agree that any legal action or proceeding between Xandr and you for any purpose concerning these Terms or the parties' obligations hereunder shall be brought exclusively in a federal or state court of competent jurisdiction sitting in New York.").

29.    Throughout this Complaint, Ms. Finch will refer to the applicable GDPR within the United Kingdom, which is the law at issue in this case, as the UK GDPR.

30.    The UK GDPR is a regulation that lays out rules relating to the protection of natural persons with regard to the processing of personal data, and rules relating to the free movement of personal data in the United Kingdom.

31.    As of January 1, 2021, the United Kingdom's withdrawal from the European Union was completed. As such, residents of the UK are no longer covered under the EU GDPR, but are instead protected under UK GDPR.

32.    Significantly, UK data protection law contains materially identical obligations to the EU GDPR as a consequence of the European Union (Withdrawal) Act 2018 and the Data Protection, Privacy and Electronic Communications (Amendments ETC) (EU Exit) Regulations 2019. A full comparison of the EU GDPR to what has been adopted in the UK is available at: https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/946117/20201102_-_GDPR_-_MASTER_Keeling_Schedule_with_changes_highlighted_V3.pdf.

33.    The vast majority of the original text of the EU GDPR, including all the material and relevant provisions as they relate to this case, are now contained in the UK GDPR.

34.    The only substantive amendment within the UK GDPR which is relevant to this Complaint is the removal of the requirement under the EU GDPR which required complaints to be filed in a European court under Article 82(6). Removal of this provision in the UK GDPR has enabled UK plaintiffs to sue outside of the UK, including within the United States.

35.    All claims brought in this case are brought under the UK GDPR.

36.    Attached hereto as Exhibit A is a full version of the UK GDPR, which now applies in England & Wales following the United Kingdom's exit from the European Union.

37.    The UK GDPR protects the fundamental rights and freedoms of natural persons and, in particular, their right to the protection of their personal data.

38.    The UK GDPR applies to the automated or structured processing of personal data, including processing in the course of an activity that falls outside the scope of EU law and processing in the course of an activity that falls within the scope of Chapter 2 of Title 5 of the Treaty on European Union. UK GDPR, Article 2.

39.    The UK GDPR applies to the relevant processing of personal data of data subjects who are in the United Kingdom by a controller or processor not established in the United Kingdom, where the processing activities are related to the monitoring of data subjects' behavior as far as their behavior takes place within the United Kingdom. UK GDPR, Article 3(2)(b).

40.    The UK GDPR applies to the processing of personal data by a controller not established in the United Kingdom, but in a place where domestic law applies by virtue of public international law. UK GDPR, Article 3(3).

41.    "Personal data" is defined as any information relating to an identified or identifiable natural person ("data subject"). An identifiable natural person is one who can be identified, directly or indirectly, in particular by reference to an identifier such as a name, an identification number, location data, **an online identifier**, or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural, or social identity of that natural person. UK GDPR, Article 4(1) (emphasis added).

42.    Recital 30 of the UK GDPR provides, "Natural persons may be associated with online identifiers provided by their devices, applications, tools and protocols, such as internet protocol addresses, **cookie identifiers** or other identifiers

such as radio frequency identification tags. This may leave traces which, in particular when combined with unique identifiers and other information received by the servers, may be used to create profiles of the natural persons and identify them." (Emphasis added.)

43.    Clearly, a uniquely identifying cookie ID falls within the definition of personal data.

44.    "Controller" is defined as the natural or legal person, public authority, agency, or other body which, alone or jointly with others, determines the purposes and means of the processing of personal data. UK GDPR, Article 4(7).

45.    The UK GDPR imposes an obligation on a controller to demonstrate compliance. According to Article 5(2), "The controller shall be responsible for, and be able to demonstrate compliance with, paragraph 1 ("accountability")."

46.    Personal data shall be processed lawfully, fairly, and in a transparent manner in relation to the data subject. Article 5(1)(a) ("lawfulness, fairness, and transparency").

47.    Personal data shall also be collected for specified, explicit, and legitimate purposes and not further processed in a manner that is inconsistent with those purposes. Article 5(1)(b) ("purpose limitation").

48.    Personal data shall be processed in a manner that ensures appropriate security of the personal data, including protection against unauthorized or unlawful processing and against accidental loss, destruction or damage, using appropriate technical or organizational measures. Article 5(1)(f) ("integrity and confidentiality").

49.    Pursuant to the UK GDPR, processing personal data is only lawful in certain circumstances. Specifically related to the claims herein[2], processing personal data shall be lawful only if:

---

[2] The UK GDPR provides other purposes which would make processing lawful. However, none of them are applicable to the facts of this case.

    a.  The data subject has given consent to the processing of his or her personal data for one or more specific purposes; or

    b.  The processing is necessary for the purposes of the legitimate interests pursued by the controller or by a third party, except where such interests are overridden by the interests or fundamental rights and freedoms of the data subject which require protection of personal data.

50.    Consent of a data subject means any freely given, specific, informed and unambiguous indication of the data subject's wishes by which he or she, by a statement or by a clear affirmative action, signifies agreement to the processing of personal data relating to him or her. UK GDPR, Article 4(11).

51.    The UK GDPR places additional requirements on data controllers, such as requiring the controller to provide certain information to the data subject. UK GDPR, Article 13-14.

52.    The UK GDPR provides a private right of action to a data subject who considers that his or her rights under the UK GDPR have been infringed as a result of the processing of his or her personal data in violation of the UK GDPR. UK GDPR, Article 79(1).

53.    Any person who has suffered material or non-material damage as a result of an infringement of the UK GDPR shall have the right to receive compensation from the controller or processor for the damage suffered. UK GDPR, Article 82(1).

54.    Loss of control of data is a form of damage under the UK GDPR.

55.    Any controller involved in processing **shall** be liable for the damage caused by processing which infringes the UK GDPR. UK GDPR, Article 82(2) (emphasis added).

56.     National regulators within the European Economic Area have issued significant fines for unlawful cookie placement in violation of the EU GDPR (which is substantively identical to UK GDPR) against Amazon[3] and Google.[4] Similarly, the European Union's highest court, the Court of Justice of the European Union (CJEU) has ruled to judicially sanction consent- and controllership-related breaches of third party tracking behavior, such as Xandr's unlawful conduct complained of herein (see the Planet 49 case[5] and the Fashion ID case[6]).

## COMMON FACTUAL ALLEGATIONS

### Xandr's Actions

57.     Xandr is a digital advertising technology business.

58.     Xandr claims that it "provides an advertising technology that allows websites, apps and other internet-connected properties to generate revenue by showing advertisements to their users, and allows marketers and other advertisers to show advertisements to individuals online who may be interested in their products or services."[7]

59.     Xandr is a "controller," as defined in Article 4(7) of the UK GDPR.

60.     Xandr is the legal person who determines the purposes and means of the processing of personal data.

---

[3] https://www.cnil.fr/en/cookies-financial-penalty-35-million-euros-imposed-company-amazon-europe-core

[4] https://www.cnil.fr/en/cookies-financial-penalties-60-million-euros-against-company-google-llc-and-40-million-euros-google-ireland

[5] https://curia.europa.eu/juris/liste.jsf?num=C-673/17

[6] https://curia.europa.eu/juris/liste.jsf?num=C-40/17

[7] *Xandr's Platform Privacy Policy*, https://www.xandr.com/privacy/platform-privacy-policy/ (last modified: June 21, 2021).

61.    Xandr willingly admits to being the controller of the data subjects' personal data in its privacy policy.[8]

62.    Xandr is established in the United States, not the United Kingdom.

63.    Xandr's certified its compliance with the EU-U.S. Privacy Shield Framework in 2016; however, such registration ceased in March 2021.

64.    Xandr's participation in the Privacy Shield means that it committed to fully comply with foreign law, including the UK GDPR.

65.    Xandr's participation in the Privacy Shield further subjects itself to investigation and enforcement of any UK GDPR violations by the U.S. Federal Trade Commission.

66.    Xandr operates a supply side platform. This essentially means that it assists websites (known in the industry as "publishers") with their management and sale of advertising space.

67.    According to Xandr's website, Xandr provides an advertising technology that allows websites, apps and other internet-connected properties to generate revenue by showing advertisements to their users, and allows marketers and other advertisers to show advertisements to individuals online who may be interested in their products or services

68.    Supply side platforms are a cornerstone of the infrastructure that allows targeted online advertising.

69.    As part of its business practices, Xandr placed unique and therefore individuating identifiers in the form of cookies on Ms. Finch's device and Class Members' devices (hereafter referred to as "setting cookies") and used those uniquely

---

[8] *Id.* ("If you are located in one of the European Countries, Xandr may act a "controller" as defined under applicable law when processing your personal data. Xandr may also act as a "processor" as defined under applicable law to the extent that it processes your personal data on behalf of and at the instruction of another party, for example a Xandr client.")

identifying cookies to monitor and track Ms. Finch's and Class Members' behavior as it took place in the United Kingdom.[9]

70.    The Xandr cookie itself is simply a static text file stored by the user's browser. It is not this static file that is in breach of the UK GDPR, but the act of setting and reading this file. Any time the Xandr cookie is interacted with is covered by the UK GDPR and it is these interactions, not the text file itself, that is the focus of this Complaint.

71.    The uniquely identifying Xandr cookie is the "uuid2" cookie set and read from the adnxs.com domain. The uuid2 cookie has a cookie ID in the form of an alphanumeric string.

72.    Each uuid2 cookie ID is unique and, thus, uniquely identifies an individual user.[10]

73.    While not all cookies uniquely identify data subjects, the unique ID of Xandr's uuid2 cookie does uniquely identify the data subject because it allows Xandr as the data controller to single out individual users and their internet activity.

74.    The cookie ID, as an identification number, is thus considered personal data as defined by Article 4(1) of the UK GDPR.

---

[9] *Id.* "When you first visit a Digital Property, we assign a random unique identifier (an 'AppNexus ID', or 'Xandr ID') to your browser or device, which allows the Platform to automatically recognize your browser or device the next time it visits another Digital Property that has integrated our technology. This allows our clients and partners to sync their own unique identifiers against this ID so that they can use their own data on the Platform that they may have associated with you (collectively 'Digital Identifiers'). The Platform uses cookies, beacons, pixels, tags, mobile SDKs, and similar technologies to collect this information."

[10] Hereafter, this Complaint will refer to the Xandr uuid2 cookie as "the Xandr cookie" and the Xandr uuid2 cookie ID as "the cookie ID."

75.    A unique cookie ID has been expressly denoted as personal data by the Information Commissioner's Office, a UK independent regulatory office which assists with enforcement of the UK GDPR.

76.    The cookie ID is created and assigned when Xandr places a cookie on the data subject's computer.

77.    The placement of the cookie ID on data subject's browsers alone is sufficient injury to be actionable under the UK GDPR.

78.    The unique cookie ID is then used to track data subjects across websites, while collecting personal information, through the reading of that cookie alongside gathering other personal data.

79.    Xandr has processed a vast amount of personal data through the company's tracking, analyzing, profiling, and disclosure of personal data to third parties.

80.    Xandr claims to process 11.4 billion daily ad impressions.[11]

81.    Tracking natural persons across websites without a legal basis and without the data subject's freely given, specific, informed, and unambiguous consent is a violation of the UK GDPR.

82.    The creation and assignment of unique identifiers (unique cookie IDs) to data subjects, the use of those unique identifiers to track data subjects across websites, and the subsequent analysis and sharing of data about the online behavior of data subjects identified with those unique cookie IDs constitutes the "processing of personal data" pursuant to Article 4(2).

83.    Xandr is a data controller and processes the personal data of Ms. Finch and class members without a legal basis as required under the UK GDPR.

---

[11] https://web.archive.org/web/20190830145245/https://www.appnexus.com/sell
*See also* https://brave.com/wp-content/uploads/2019/07/Scale-billions-of-bid-requests-per-day-RAN2019061811075588.pdf

84. The purpose for which the unique Xandr cookie ID is created and subsequently used is not fully disclosed to the data subject in advance.

85. In fact, data subjects do not interact directly with Xandr, but instead only interact through publishers' websites.

86. Xandr uses the unique cookie ID to record Ms. Finch and Class Members' visits to websites and their browser-generated information ("BGI") on those websites, which includes activity and actions on the websites.

87. Online tracking using uniquely identifying cookies and the use of personal data collected via uniquely identifying cookies for behavioral advertising are activities which constitute processing of personal data such that it is subject to the UK GDPR.

88. The information Xandr collects from data subjects includes browser, device, location, activity, audience segmentation, ads served, viewed or clicked on, and internet service:

- **Information about your browser including**: the type of browser you use, browser language, browser settings, and cookie information. This may include data about you related to bid requests an ad impressions, collected when we decide to show you an ad on a Digital Property and when we deliver an ad.

- **Information about your device** including device operating system version, connection type, device make, device model, device Identifiers such as your IDFA or AAID, and the IP address from which the device accesses a client's Digital Property.

- **Location information, including precise location information** when location services have been enabled for an app on your device that has integrated our technology or that sends that information to our Platform.

- **Information about your activity on a Digital Property** such as browsing history, viewing history, search history and information regarding an individual's interaction with an internet website, app, or advertisement, including the time web pages or apps were visited or used, including in-game or online viewing activity (e.g., videos viewed, pages viewed).

- **Inferences or audience segmentation** derived from Platform Data, such as individual profiles, preferences, characteristics, and behaviors.
- **Information about ads served, viewed or clicked on**, including the type of ad, where the ad was served, whether you clicked on it and whether you visited the advertiser's website or downloaded the advertiser's app.
- **Information about your internet service** including information about which internet service provider is used by you.[12]

89.     When the Xandr cookie ID is set and the cookie information is read, information is sent to Xandr's servers. As admitted in its Privacy Policy, such information sent includes information about a data subject's browser, device, precise location, digital property, ads viewed or clicked, and internet service provider.

90.     The cookie ID and the data collected by Xandr from Ms. Finch and Class Members constitute personal data pursuant to Article 4(1) of the GDPR because it is information relating to an identified or identifiable natural person.

91.     Specifically, the cookie ID functions as a unique identifier for data subjects, including Ms. Finch and Class Members. Further, other data collected by Xandr, such as BGI and individual's IP addresses, also constitutes personal data.

92.     In creating the cookie ID, and thus personal data, Xandr is processing Ms. Finch and Class Members' personal data without a lawful basis.

93.     In using the cookie ID to monitor Ms. Finch and Class Members and/or gather BGI on them, Xandr is processing Ms. Finch's and the Class Members' personal data without a lawful basis.

94.     Xandr engages in "cookie syncing" where it exchanges cookie-based information with other companies as a user browses websites.

---

[12] *Id.*

95.    Cookie syncing is one of many advertising technology tools, referred to generally as "AdTech" in the industry, that helps agencies and brands target, deliver, and analyze digital advertising efforts.

96.    Cookie syncing between AdTech businesses involves one AdTech business sending information about the cookie ID it has assigned to a user with at least one other AdTech business, and receiving the cookie IDs that those other AdTech businesses have assigned to the same user. This permits the participating AdTech businesses to communicate about that user away from the user's device despite using different cookie IDs to identify that user.

97.    Specifically, Xandr engages in cookie syncing by storing third-party cookies that reference the cookie IDs set by other AdTech businesses with which it has synced.

98.    Pursuant to Article 25(2), Xandr must ensure that by default personal data is not made accessible without the data subject's intervention to an indefinite number of natural persons.

99.    By engaging in cookie syncing, data subjects' unique cookie IDs, and potentially their BGI, are shared with any company with which Xandr syncs cookies. However, neither Ms. Finch and Class Members are told the identity of these third parties, which means they cannot give informed consent to their personal data being shared with them as is required under the UK GDPR.

100.    Such cookie syncing is meant to allow advertisers and their service providers to identify the data subject while minimizing the number of cookie syncing calls on the data subject's browser.

101.    By using unique cookie IDs, BGI associated with those unique cookie IDs, and cookie syncing, Xandr is able to help publishers monetize their websites by auctioning advertising slots, at the expense of the data subject's statutory rights under the UK GDPR.

102.   Xandr initiates a bidding process by sharing data subjects' personal data, including BGI attached to the unique cookie IDs, into the Real-time Bidding ("RTB") system.

103.   The RTB system allows third parties to bid to target advertising to data subjects, and in this case Ms. Finch and Class Members, when they visit websites.

104.   The advertising slots are then auctioned in the RTB system.

105.   The targeted advertising seeks to allow website advertisers to better spend their marketing dollars, allowing them to capitalize on their most targeted subjects while Xandr unlawfully provides the personal data of data subjects, including Ms. Finch and Class Members.

106.   Xandr submits bid requests from publishers it works with into the RTB system, which includes ad exchanges and demand side platforms.

107.   Demand side platforms then submit bid responses to Xandr's bid requests.

108.   Xandr arranges for the highest bidders to place their advertising in the available ad slot.

109.    The Interactive Advertising Bureau has created the following visual representation of the process[13]:



110.    Essentially, Xandr's unique cookie ID and the BGI attached to it claims to allow the demand side platform (on behalf of its advertiser clients) to connect the Xandr cookie ID to the records of a given data subject identified through other identifiers developed through cookie syncing such that the identity of the data subject becomes known and the demand side platform (advertiser) can better determine what advertisements to place in front of that data subject.

111.    Each bid request therefore sends personal data to any party who has access to the RTB bid stream.

112.    Upon information and belief, this personal data is disseminated to thousands of entities, the identities of which are likely even unknown to Xandr. Thus, Xandr cannot accurately determine who or what entities receive users' personal data and cannot control their use of said data.

113.    Xandr shares this personal data with the knowledge that it will be shared further to an unknown set of recipients (in violation of Article 25(2)), some of

---

[13] http://data.iab.com/ecosystem.html

whom are also data controllers, and who will use the personal data for profiling and/or targeting the data subjects with advertising.

114. This goes to the very heart of the infringements of UK GDPR: consent cannot be valid if it is not specific and informed.

115. As the ICO notes "This means you need to identify yourself, and also name any third party controllers who will be relying on the consent."[14]

116. Further, by using cookie syncing, Xandr is able to maintain integrations with hundreds of other AdTech intermediaries so that the same identifiers are used by all parties in the online advertising ecosystem.

117. Websites then use Xandr's services to record data subjects' visits and browsing behavior to enable the targeting of advertisements when data subjects visit their pages.

118. Xandr provides a list of nearly 2000 third party partners with which it may share data subjects' personal data.[15] However, data subjects have no way to know with which of these partners their data is actually shared.

119. Xandr's scope of processing and use of personal data far exceeds what is specified to the data subjects at the point that personal data is collected or produced.

120. Xandr violates the "data minimization" principle, which requires that personal data shall be adequate, relevant and limited to what is necessary in relation to the purpose for which the data is processed. Article 5(1)(c).

---

[14]   https://ico.org.uk/for-organisations/guide-to-data-protection/guide-to-the-general-data-protection-regulation-gdpr/consent/what-is-valid-consent/#what3

[15] https://docs.xandr.com/bundle/service-policies/page/third-party-providers.html

121.   Xandr admits that the cookie ID placed and read by Xandr and the BGI generated therefrom constitutes "personal data" within Article 4(1) of the UK GDPR.[16]

122.   Xandr is subject to the UK GDPR because its processing activities are related to the monitoring of data subjects' behavior while they are located within the United Kingdom.

123.   Xandr sets and reads cookies on hundreds of the most trafficked websites in the UK, which appear to rely on digital advertising revenue.

124.   These websites include a variety of sectors, such as news and information, banking, utilities, telecommunications, corporate, academic and charity sites, just to name a few.

125.   Approximately 37% of UK websites use Xandr to track and identify users.

126.   Xandr's actions, both in setting the cookie ID and its subsequent monitoring of data subjects behavior constitute violations of the UK GDPR.

127.   Xandr's systematic infringements of personal data rights allow it to collect more personal data than other regulatory compliant competitors, conferring an unfair competitive advantage to Xandr over competitor businesses (many located in the US) with UK GDPR-compliant business models.

**Xandr Fails to Process Personal Data Lawfully**

128.   In order for Xandr to lawfully process personal data under the UK GDPR, Xandr must obtain consent from the data subject. UK GDPR, Article 6(1)(a).

---

[16] "If you are located in the European Economic Area, the United Kingdom, or Switzerland (the "European countries"), you have certain rights and protections under applicable law regarding the processing of your "personal data" as defined under applicable law. Some of the Platform Data that Xandr maintains in its Platform may constitute "personal data" under these laws. https://www.xandr.com/privacy/platform-privacy-policy/#where_operate

129.    Consent of a data subject means any freely given, specific, informed and unambiguous indication of the data subject's wishes by which he or she, by a statement or by a clear affirmative action, signifies agreement to the processing of personal data relating to him or her.

130.    Recital 42 provides that for consent to be informed, the data subject should be aware at least of the identity of the data controller and the purposes of the processing for which the personal data are intended.

131.    Further, Article 7, Conditions for Consent, provides:

    a.  Where processing is based on consent, the controller shall be able to demonstrate that the data subject has consented to processing of his or her personal data.

    b.  If the data subject's consent is given in the context of a written declaration which also concerns other matters, the request for consent shall be presented in a manner which is clearly distinguishable from the other matters, in an intelligible and easily accessible form, using clear and plain language. Any part of such a declaration which constitutes an infringement of this Regulation shall not be binding.

    c.  The data subject shall have the right to withdraw his or her consent at any time. The withdrawal of consent shall not affect the lawfulness of processing based on consent before its withdrawal. Prior to giving consent, the data subject shall be informed thereof. It shall be as easy to withdraw as to give consent.

    a.  When assessing whether consent is freely given, utmost account shall be taken of whether, inter alia, the performance of a contract, including the provision of a service, is conditional on

consent to the processing of personal data that is not necessary
for the performance of that contract.

132.    Xandr acknowledges in its policies that users have rights and
protections regarding use of their personal data, including the right to object to the
processing of personal data.

133.    Xandr has failed to directly obtain consent from data subjects.

134.    Xandr states in its consent policies that, "In some cases, we may rely on
your consent which is obtained for us by the operator of the Digital Properties that
use our technology or use technology that interacts with our Platform. If we rely on
consent to process your data, we will obtain such consent in compliance with
applicable laws."[17]

135.    Xandr cannot simply outsource or delegate its obligations for consent
and then turn a blind eye to whether the publisher actually complies with the consent
requirements. The ICO stated in its June 2019 AdTech Report[18] at page 21, that
organizations cannot rely on standard terms and conditions by themselves without
undertaking appropriate monitoring and ensuring technical and organization's
controls back up those terms.[19]

136.    In addition, any reliance by Xandr on consent obtained by publishers is
insufficient because: (1) users are unable to know when Xandr claims to rely on
publisher consent, (2) in most (if not all) instances, the publisher's consent is not
sufficient under the UK GDPR, and (3) Xandr fails to assure ongoing compliance.

---

[17] https://www.xandr.com/privacy/platform-privacy-policy/#europe

[18] https://ico.org.uk/about-the-ico/what-we-do/our-work-on-adtech/

[19] Information Commissioner's Office, Update report into adtech and real time
bidding,    June    20,    2019,    accessible    at    https://ico.org.uk/media/about-the-
ico/documents/2615156/adtech-real-time-bidding-report-201906-dl191220.pdf.

137. At present, the majority of websites that enable the use of Xandr cookies have non-compliant cookie banners and/or privacy policies, or no consent collection mechanism at all. In addition, a number of websites place Xandr cookies before the consent banner click boxes have even been selected by a visitor and in some cases irrespective of whether the data subject has clicked "I Consent" or "I Do Not Consent."

138. For example, Xandr's website has a cookie banner but sets both first party (Xandr.com; adnxs.com; att.com) and third party cookies (such as (omtrdc.net and demdex.net (Adobe); google.com and doubleclick.net (Google); inq.com (Nuance); agkn.com (Neustar); bing.com (Microsoft); flashtalking.com; and facebook.com) before consent is actually obtained.



139. Similarly, Britannica, a website that Ms. Finch visited and which Xandr interacts with, has no cookie banner or option for consent prior to placing cookies.



140.    Additionally, Samsung's website, a website Ms. Finch visited and which interacts with Xandr, provides a cookie banner for consent but loads cookies before the consent is ever obtained and the cookie banner itself is non-compliant.



141.    Because the vast majority of websites using Xandr do not have fully compliant cookie banners, Xandr was in breach of its obligation to undertake

"appropriate monitoring and ensuring technical and organization's controls back up those terms" as required by the ICO, and it clearly did not rely on first-party publishers to gather valid consent.

142.    Further, specific names of data controllers receiving the cookie IDs and associated BGI were not fully disclosed to data subjects, including Ms. Finch and Class Members, in advance, such that any consent received was not compliant and therefore, not valid.[20]

143.    Xandr clearly has no system in place to check whether its clients (the publishers) are obtaining valid consent and this continues to be the case.

144.    Even when reading Xandr's privacy policy, users have no way of knowing whether Xandr is relying on consent or legitimate interests, as it is unclear as to when each lawful basis is used, as a result of deliberately obfuscatory and unclear language.[21]

145.    The ICO takes the view that, where processing is originally based on consent, a data controller cannot subsequently switch the basis of processing and rely

---

[20] European Data Protection Board opinion on consent ("in a case where the consent sought is to be relied upon by multiple (joint) controllers or if the data is to be transferred to or processed by other controllers who wish to rely on the original consent, these organizations should all be named").

[21] "Legal Basis for Processing: Xandr's legal basis for processing your personal data depends upon the specific context in which we collect or use it. We normally rely on our legitimate interests to collect and use personal data, except where our interests are overridden by your data-protection interests or your fundamental rights and freedoms. Our legitimate interests are described in greater detail in the "How We Use the Information We Collect" section of this policy. These legitimate interests include the operation of our Platform and business and the provision of our online advertising technology services to our clients as required by our agreements with them. In some cases, we may rely on your consent which is obtained for us by the operator of the Digital Properties that use our technology or use technology that interacts with our Platform. If we rely on consent to process your data, we will obtain such consent in compliance with applicable laws. Additionally, we may have a legal obligation to process personal data." https://www.xandr.com/privacy/platform-privacy-policy/#europe

instead on legitimate interests. Switching the basis of processing in this way is confusing for data subjects, and retrospectively invalidates the basis on which any consent was sought and given. The problem is particularly acute when the data controller does not interact directly with data subjects but instead relies on website publishers to do so on its behalf which considerably increases the risk that the data subjects will be confused and misled about the basis on which their data is being processed.

146.   As the controller of the data, Xandr has the responsibility to ensure that consent is valid, but consistently fails to do so.

147.   At no time was consent "freely given," "specific," "informed," and "unambiguous" by Ms. Finch or Class Members.

148.   Ms. Finch had not interacted with Xandr before she was subject to the company's tracking for online advertising such that she had no reasonable expectation for Xandr to process her personal data.

149.   Xandr cannot rely on its legitimate interest in processing personal data, which is its normal legal basis for processing.

150.   Consent is the only lawful basis for Xandr's processing of Ms. Finch and Class Members personal data.

151.   Numerous sources support this conclusion.

152.   Pursuant to the Privacy and Electronic Communications (EC Directive) Regulations 2003/2426, cookies may only be lawfully placed on a device where the user has given his or her consent.

153.   The ICO made clear that, if consent is required under the Privacy and Electronic Communications Regulations, then the data controller cannot rely on the full range of possible lawful grounds provided by Article 6 of the UK GDPR. The ICO AdTech opinion of the ICO dated June 2019 says that consent is the only lawful basis for "business as usual" Real-time Bidding processing of personal data.

154. Thus, in this case, Xandr cannot rely on its legitimate interest for its lawful basis of processing under UK GDPR.

155. Even if it were not precluded as a matter of law, the balance of interests required to be undertaken by Xandr in order to rely on this basis for lawful processing does not support Xandr's processing of personal data.

156. Since Xandr claims to rely on legitimate interest as a lawful ground, it will still be analyzed herein.

157. Xandr states in its consent policy that it "normally rel[ies] on our legitimate interests to collect and use personal data, except where our interests are overridden by your data-protection interests or your fundamental rights and freedoms."

158. Recital 47 of the UK GDPR states that:

> [t]he legitimate interests of a controller, including those of a controller to which the personal data may be disclosed, or of a third party, may provide a legal basis for processing, provided that the interests or the fundamental rights and freedoms of the data subject are not overriding, taking into consideration the reasonable expectations of data subjects based on their relationship with the controller. Such legitimate interest could exist for example where there is a relevant and appropriate relationship between the data subject and the controller in situations such as where the data subject is a client or in the service of the controller. At any rate the existence of a legitimate interest would need careful assessment including whether a data subject can reasonably expect at the time and in the context of the collection of the personal data that processing for that purpose may take place. The interests and fundamental rights of the data subject could in particular override the interest of the data controller where personal data are processed in circumstances where data subjects do not reasonably expect further processing. Given that it is for the legislator to provide by law for the legal basis for public authorities to process personal data, that legal basis should not apply to the processing by public authorities in the performance of

their tasks. The processing of personal data strictly necessary for the purposes of preventing fraud also constitutes a legitimate interest of the data controller concerned. The processing of personal data for direct marketing purposes may be regarded as carried out for a legitimate interest.

159.    The ICO, in the same June 2019 AdTech report, found that "reliance on legitimate interests for marketing activities is possible only if organisations [sic] don't need consent under PECR and are also able to show that their use of personal data is proportionate, has a minimal privacy impact, and individuals would not be surprised or likely to object. We believe that the nature of the processing within [Real-time Bidding] makes it impossible to meet the legitimate interests lawful basis requirements. This means that legitimate interests cannot be used for the main bid request processing. This is the case even if it were possible for legitimate interests to be applicable elsewhere in the RTB ecosystem...."

160.    A data controller, including Xandr, cannot claim a legitimate interest where such interests are overridden by the interests or fundamental rights and freedoms of the data subject which require protection of personal data.

161.    Essentially, a business' legitimate interest based upon its own commercial enterprise is self-serving and is not enough to satisfy the legitimate interest required by the UK GDPR. Permitting Xandr to argue a legitimate interest based solely on a desire to support its business model would render the UK GDPR meaningless.

162.    In order to legally rely on the legitimate interest basis, it is necessary for the data controller to identify a legitimate interest, show that the processing in question is necessary to achieve it, and balance that interest against the individual's interests, rights, and freedoms.

163.    Further, to satisfy the legitimate interest purpose, Xandr would have to undertake and provide a full assessment of the interests of the parties. Article 35

requires Xandr to have conducted a Data Protection Impact Assessment. In fact, the ICO made clear in its June 2019 AdTech report that Data Protection Impact Assessments are mandatory for processing through the Real-time Bidding system.

164.    No such assessment was disclosed or provided by Xandr to Ms. Finch or Class Members.

165.    Thus, even though Xandr is precluded by law from relying on its purported legitimate interests, Xandr's own business interests are clearly overridden by the interests and fundamental rights and freedoms of Ms. Finch and Class Members, particularly given the scale and intrusiveness of the processing.

166.    Therefore, Xandr cannot rely on its purported legitimate interest to satisfy its compliance obligations under the UK GDPR.

167.    Xandr, as the data controller, is responsible for demonstrating compliance and accountability.

168.    Xandr is unable to meet this obligation.

169.    Xandr lacks a lawful basis for its processing of data subjects' personal data, including Ms. Finch and Class Members.

**Xandr Lacks Transparency in Its Processing of Personal Data**

170.    Personal data shall be processed lawfully, fairly, and in a transparent manner in relation to the data subject. Article 5(1)(a) ("lawfulness, fairness, and transparency").

171.    By creating and sharing the unique cookie ID and other BGI with other data controllers (who use the personal data for profiling and targeting), Xandr has processed the personal data of data subjects, including Ms. Finch and Class Members, without a lawful basis and without meeting the requirement for transparency in such processing.

172.    In addition to transparency being listed as one of the requirements in Article 5(1)(a), separate requirements exist in Articles 13 and 14, which are

frequently treated together and place requirements on data controllers to provide certain information to the data subjects.

173.    Specifically, Article 13(1) requires a data controller who collects personal data to provide to the data subjects information, such as:

a.  The identity and the contact details of the controller and, where applicable, of the controller's representative;

b.  The contact details of the data protection officer, where applicable;

c.  The purposes of the processing for which the personal data are intended, as well as the legal basis for the processing;

d.  Where the processing is based on point (f) of Article 6(1), the legitimate interests pursued by the controller or by a third party;

b.  The recipients or categories of recipients of the personal data, if any; and

c.  Where applicable the fact that the controller intends to transfer personal data to a third country or international organization, the existence or absence of relevant adequacy regulations under section 17A of the 2018 Act, or reference to the appropriate or suitable safeguards and the means to obtain them.

174.    Article 13(2) further requires disclosure of the following information necessary to ensure fair and transparent processing:

a.  Period for which personal data will be stored;

b.  Existence of the right to request access or restrict processing or object to processing;

c.  The existence of the right to withdraw consent at any time;

d.  The right to lodge a complaint with the Commissioner;

e. Whether the provision of personal data is a statutory or contractual requirement or necessary to enter into a contract; and

f. Existence of automated decision making.

175. Articles 14(1)-(2) have nearly identical disclosure requirements.

176. In addition to the controller providing the information listed in Articles 13 and 14, the notification should be provided in a concise, transparent, intelligible, and easily accessible form, using clear and plain language.

177. Pursuant to Recital 58, transparency is particularly important in situations where the proliferation of actors and the technological complexity of practice make it difficult for the data subject to know and understand whether, by whom and for what purpose personal data relating to him or her are being collected, such as in the case here: targeted online advertising.

178. Recital 39 of the UK GDPR provides, in relevant part, that "any processing of personal data should be lawful and fair. It should be transparent to natural persons that personal data concerning them are collected, used, consulted or otherwise processed and to what extent the personal data are or will be processed. The principle of transparency requires that any information and communication relating to the processing of those personal data be easily accessible and easy to understand, and that clear and plain language be used. That principle concerns, in particular, information to the data subjects on the identity of the controller and the purposes of the processing and further information to ensure fair and transparent processing in respect of the natural persons concerned and their right to obtain confirmation and communication of personal data concerning them which are being processed."

179. Recital 60 of the UK GDPR provides that, "The principles of fair and transparent processing require that the data subject be informed of the existence of the processing operation and its purposes. The controller should provide the data

subject with any further information necessary to ensure fair and transparent processing taking into account the specific circumstances and context in which the personal data are processed. Furthermore, the data subject should be informed of the existence of profiling and the consequences of such profiling. Where the personal data are collected from the data subject, the data subject should also be informed whether he or she is obliged to provide the personal data and of the consequences, where he or she does not provide such data. That information may be provided in combination with standardised [sic] icons in order to give in an easily visible, intelligible and clearly legible manner, a meaningful overview of the intended processing. Where the icons are presented electronically, they should be machine-readable."

180.    Xandr completely fails to satisfy Article 5(1)(a) regarding transparency and Articles 13 and 14 as it does not provide all of the required information to data subjects, including Ms. Finch and Class Members.

181.    Xandr violates the transparency principle as data subjects, including Ms. Finch and Class Members, do not know what data is held on them, where that data is held, to whom it is transferred, and how it is processed.

182.    In fact, most (if not all) Class Members never have a direct relationship with Xandr.

183.    Xandr's failure to name the specific recipients of each data subjects' personal data is a further breach of transparency in its processing.

184.    Personal data shall also be collected for specified, explicit and legitimate purposes and not further processed in a manner that is inconsistent with those purposes. Article 5(1)(b) ("purpose limitation").

185.    Xandr's scope of processing and use of personal data of the data subjects, including Ms. Finch and Class Members, far exceeds what is specified to the data subjects at the point where the personal data is collected or produced.

186.    Personal data shall be processed in a manner that ensures appropriate security of the personal data, including protection against unauthorized or unlawful processing and against accidental loss, destruction or damage, using appropriate technical or organizational measures. Article 5(1)(f) ("integrity and confidentiality").

187.    Xandr's actions, including cookie syncing and its sharing of data subjects' personal data without proper monitoring, are done in such a way that Xandr is prevented from appropriately protecting and ensuring confidentiality and security of the personal data of data subjects, including Ms. Finch and Class Members.

188.    Xandr's processing of personal data via the creation of unique cookie IDs and the collection of associated BGI constitutes intrusive, extensive, and unexpected loss of control of personal data.

189.    As the controller involved in processing, Xandr is liable for the damage caused by its processing, which infringes the GDPR.

190.    Ms. Finch and the Class Members have suffered injury from Xandr's use and transmission of their personal data in the form of loss of control of their personal data.

191.    Once the personal data is shared across AdTech platforms, it cannot realistically be recovered or reverted to private, personal information.

192.    Article 82 of the UK GDPR provides that any person who has suffered material or non-material damage as a result of an infringement of the UK GDPR shall have the right to receive compensation from the controller or processor for the damage suffered.

193.    The UK GDPR specifically references "loss of control over [] personal data" as a type of damage in Recital 85.

194.    Further, according to Sir Geoffrey Vos Chancellor of the High Court in *Lloyd v. Google*, [2019] EWCA Civ. 1599, "Damages are in principle capable of being

awarded for loss of control of data under article 23 and section 13, even if there is no pecuniary loss and no distress."[22]

## PLAINTIFF'S FACTS

195.    Ms. Finch is a citizen of the United Kingdom.

196.    Ms. Finch is a "data subject" as that term is defined in Article 4(1) of the GDPR.

197.    Ms. Finch frequently browses websites while she is located within the United Kingdom.

198.    Some websites that Ms. Finch visited while in the United Kingdom that interact with Xandr included Samsung.com, gooutdoors.co.uk, Britannica.com, thefreedictionary.com and bt.com, just to name a few.

199.    On December 2, 2019, at 11:48:15, Xandr placed a cookie with a unique cookie ID on Ms. Finch's device as she was browsing websites while located within the United Kingdom.

200.    This cookie was served from Xandr's "adnxs.com" domain.

201.    Specifically, as of the time of filing the Complaint, Ms. Finch had 5 Xandr cookies on her Chrome browser, including the uniquely identifying cookie called uuid2 with ID 5673958346541717400, as well as "syncing" cookies such as "uids," "anj," "usersync," and "icu."

202.    Xandr used this unique cookie ID and the syncing cookies placed on Ms. Finch's device to record Ms. Finch's visits to websites and her BGI to collect and associate her website browsing behavior while she was within the United Kingdom.

203.    Once Xandr placed the cookie ID on Ms. Finch's device, it then tracked Ms. Finch's visits to websites, including her specific online behavior.

---

[22] This reference is to the predecessor legislation, but the same conclusion applies to Article 82. *See* ¶¶ 64-65 of *Lloyd v. Google*. This case is currently on appeal to the U.K. Supreme Court.

204.    Upon information and belief, Xandr collected the following information on Ms. Finch:

a. **Information about her browser including**: the type of browser she used, browser language, browser settings, cookie information, and data about her related to bid requests and ad impressions.

b. **Information about her device** including device operating system version, connection type, device make, device model, device Identifiers such as her IDFA or AAID, and the IP address.

c. **Location information, including precise location information** when location services have been enabled for an app on her device that has integrated Xandr's technology or that sends that information to its Platform.

d. **Information about her activity on a Digital Property** such as browsing history, viewing history, search history and information regarding her interaction with an internet website, app, or advertisement, including the time web pages or apps were visited or used, including in-game or online viewing activity (e.g., videos viewed, pages viewed).

e. **Inferences or audience segmentation** derived from Platform Data, such as individual profiles, preferences, characteristics, and behaviors.

f. **Information about ads served, viewed or clicked on**, including the type of ad, where the ad was served, whether she clicked on it and whether she visited the advertiser's website or downloaded the advertiser's app.

> g. **Information about her internet service** including information about which internet service provider is used by her.

205.    The BGI collected by Xandr using the cookie ID is used by Xandr to track, monitor, and process Ms. Finch's personal data and is sent into the RTB system such that Ms. Finch's personal data is used so that targeted advertisements can be targeted at her.

206.    Xandr engaged in "cookie syncing" with cookies on Ms. Finch's device where it exchanged cookie-based information with other companies operating as data controllers as Ms. Finch browsed from website to website.

207.    Ms. Finch's cookie ID and the BGI constitute "personal data" within the definitions of that term under Article 4(1) of the GDPR.

208.    At all relevant times, Ms. Finch was unaware of Xandr's use and transmission of her personal data.

209.    At the time of the cookie placement, Ms. Finch had no idea that Xandr placed cookies on her device, let alone processed and controlled her personal data for use in the RTB system.

210.    Ms. Finch did not consent to Xandr's use, monitoring, processing, and transmission of her personal data.

211.    In fact, Ms. Finch was not informed by Xandr about how her personal data would be used, when it would be used, or who it would be provided to.

212.    Xandr did not have a legitimate interest in its use of Ms. Finch's personal data.

213.    Xandr had and has no lawful basis for using, processing, and transmitting Ms. Finch's personal data.

214.    Xandr was not transparent with Ms. Finch with regards to her personal data.

215.   Xandr's actions included the monitoring of Ms. Finch's and Class Members' behavior as it took place within the United Kingdom by a data controller located (at Xandr's own admission) in the United States.

216.   Such use of Ms. Finch's personal data is a violation of the Data Protection Principles set out in Article 5 of the UK GDPR and the rights provided for in Chapter 3 of the UK GDPR.

217.   By using the cookie ID and associated BGI, Xandr unlawfully obtained, monitored, and used Ms. Finch's personal data without her consent.

218.   Ms. Finch was injured by Xandr's use, processing, and transmission of her personal data as she suffered a loss of personal data and privacy.

219.   Ms. Finch continues to be injured by Xandr's actions because erasure of the personal data will not remedy the infringement since her personal data was disclosed to a number of unidentified third parties, which Xandr cannot exhaustively identify, without a legal basis.

## JURISDICTION IS MOST APPROPRIATE IN NEW YORK  [didn't we say this already in the jurisdiction/venue section]?

220.   Xandr's corporate offices and principle place of business is in New York.

221.   Xandr's Privacy Policy states that Xandr, Inc. is a global company headquartered in the United States with data centers located in the United States, Europe, and Asia.

222.    Xandr previously certified compliance with the EU-U.S. Privacy Shield Framework.

223.   Xandr admits that "information may be transferred to, stored and processed by us and our affiliates in our facilities in the United States and other countries (including in Singapore, Japan, Australia and Brazil where our global affiliates have offices) and by those third parties with whom we may share your information."

224.    Xandr transfers personal data outside of the EU.[23]

225.    Based on these statements, it is believed that Xandr processes personal data from data subjects located within the United Kingdom in the United States.

226.    The United Kingdom is not the proper forum. Xandr never purposefully subjected itself to personal jurisdiction in the United Kingdom.

227.    Xandr evaded its obligations to register in the United Kingdom as it failed to register with the ICO, the UK's independent authority set up to uphold information rights in the public interest and which promotes openness by public bodies and data privacy for individuals, as is a legal requirement under the Data Protection Act 2018 until March 10, 2021, which was after Ms. Finch had cookies placed on her device in the UK. This is in breach of the UK Data Protection Act 2018.

228.    Xandr has failed to identify a data protection officer (or "DPO") in its Privacy Policy. The ICO guidance states this is required if "your core activities require large scale, regular and systematic monitoring of individuals (for example, online behaviour tracking)" which is applicable to Xandr.

229.    Private and public interest factors weigh in favor of New York as the proper forum. In terms of private interests, the majority of the evidence in this case, other than the harm, is in New York. Convenience of the parties also favors New York over the United Kingdom, as Xandr's business records, executives, engineers, and other relevant witnesses are located in New York. In short, evidence of Ms. Finch and

---

[23] "When Xandr transfers your personal data to group companies or third-party service providers outside of the European Countries, we ensure that appropriate protections are in place under European data protection legislation (which includes Model Clauses). For example, in order to ensure that your personal data is adequately protected when transferred outside of the European Countries, Xandr has entered into inter-company "model clause" agreements and other adequacy arrangements with other various entities located outside the European Countries with whom we share your information. A copy of such agreements is available on request." https://www.xandr.com/privacy/platform-privacy-policy/#retention

Class Members' harm is in the United Kingdom, but evidence of Xandr's wrongdoings is in New York. New York is convenient to Xandr, as it is headquartered in New York. In terms of public interest factors, New York has a significant interest because the state must ensure that New York companies and those that choose New York as a business headquarters are held accountable in the jurisdiction they choose when they perform activities that are unlawful and affect the privacy of others. This Court is best suited to hear this case, not only because this case meets jurisdictional requirements, but because it has been contractually chosen by Xandr.[24] Further, the UK GDPR is quite straightforward and the nearly identical EU GDPR has been clearly interpreted by the European Data Protection Board, senior European Courts and English, European Union, and EEA data regulators, such that application of foreign law should not be a burden.

230.    New York is the proper venue for this litigation.

## CHOICE OF LAW ANALYSIS FAVORS APPLYING THE SUBSTANTIVE LAW OF THE UK GDPR

231.    Under the EU GDPR Article 82(6), court proceedings for exercising the right to compensation must be brought in one of the EU Member States referred to in Article 79(2). However, following Brexit on January 1, 2021, the DPA 2018 amended this portion of the EU GDPR to remove this jurisdictional requirement, showing a willingness for UK GDPR claims to be brought outside of the UK and the EU.

---

[24] https://www.xandr.com/legal/ ("These Terms shall be governed and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed in New York. You agree that any legal action or proceeding between Xandr and you for any purpose concerning these Terms or the parties' obligations hereunder shall be brought exclusively in a federal or state court of competent jurisdiction sitting in New York.").

232.    Commentary of the EU GDPR makes clear that it has extra-territorial scope. For example, in a December 2, 2019 Data Post discussing the Extra-territoriality of the EU GDPR, the European Data Protection Board (the independent body coordinating consistent application of data protection regulation across the EU's national regulators) outlines how Article 3 "aims to determine whether a particular processing activity is within the scope of the GDPR and not whether an entity is within the scope of the GDPR (i.e. a non-EU controller can be caught with respect to some data and processing…)"[25] The post goes on to say that "the GDPR seeks (via Article 3) to extend its reach beyond European borders, making non-EU organisations [sic] directly subject to its obligations when processing personal data…"

233.    In sum, the EU GDPR (later adopted by the UK) was developed to protect personal data of data subjects within the EU (which at that time included the UK), regardless of where the conduct occurred or the defendant resides. Thus, the substantive laws of the UK GDPR should be applied.

234.    New York substantive law should not be applied, as there is a compelling reason to displace it in favor of the GDPR under the laws of the United Kingdom.

235.    The United Kingdom is the jurisdiction with an interest in having its laws applied to this case, as it has an interest in protecting the data privacy of its citizens, regardless of where the potential defendant is domiciled or its conduct occurs. In fact, the drafters of the UK GDPR anticipated this situation while drafting Article 3, which is intended to apply extra-territorially. Further, the United Kingdom has an interest in having its laws applied to injuries that occur within its borders to its citizens residing within the United Kingdom.

236.    The nature and strength of the United Kingdom's interest in the application of its own law, specifically the UK GDPR, is evident. The UK GDPR was

---

[25] The full Data Post can be found at https://hsfnotes.com/data/2019/12/02/edpb-adopts-final-guidelines-on-gdpr-extra-territoriality/.

developed specifically to protect its citizens from the exact actions complained of herein against Xandr. Alternatively, the United Kingdom's interest would be more impaired if its policy were subordinated to the policies of New York, such that the laws of the United Kingdom should be applied.

**CLASS ACTION ALLEGATIONS**

237.   Plaintiff brings this action individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) seeking injunctive and monetary relief for Xandr's systematic failure to comply with the UK GDPR.

**A.    Class Definition**

238.   Plaintiff brings this action on behalf of the following class:

> **Class: All persons residing or who resided in England and Wales who used Chrome, Edge, or Internet Explorer browsers and have had a Xandr cookie placed on their device during the Relevant Time Period.**

239.   Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, employees, counsel, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

240.   The Relevant Time Period is from May 25, 2018 through the present.

241.   Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses under Rule 23(c)(5), or modified in any other way.

242.   Plaintiff is a member of the Class she seeks to represent.

243.   The unlawful personal data use practices described herein have been and are continuing in nature.

**B.    Rule 23(a) and Rule 23(b)(3) Requirements**

**a.    Numerosity**

244.    The proposed Class is so numerous that joinder of all Members is impracticable.

245.    Upon information and belief, the Class size is estimated at approximately 30 million individuals.

246.    The Class Members are ascertainable through Xandr's centralized and electronically-maintained records. Class Members are also able to self-identify by simply checking to see if they have the Xandr cookie (uuid2) on their browser.

**b.    Commonality**

247.    The prosecution of Ms. Finch's claims will require the adjudication of numerous questions of law and fact common to the Class. The common questions of law and fact predominate over any questions affecting only individual Class Members. The common questions include:

a.    Whether Xandr's Terms & Conditions comply with the UK GDPR;

b.    Whether Xandr obtained valid consent for the use of Ms. Finch and the Class Members' personal data;

c.    Whether Xandr has a legitimate interest for the processing of Ms. Finch and the Class Members' personal data;

d.    Whether Xandr processed data lawfully, fairly, and in a transparent manner;

e.    Whether Xandr has damaged Ms. Finch and the Class Members through use of their personal data;

f.    Whether the Class is entitled to damages and the amount of damages;

g.    Whether Xandr should be enjoined from continuing to be out of compliance with the UK GDPR;

h.    Whether the UK GDPR should apply to Ms. Finch and the Class Members' claims; and

i.    In other ways as shown in discovery.

### c.    Typicality

248.    Ms. Finch has suffered the same violations and similar injuries as other Class Members arising out of and caused by Xandr's common course of conduct. All Class Members were subject to the same corporate practices as alleged herein, in particular, by having a unique cookie ID placed on their device which was used to collect BGI, which constituted personal data, and which was unlawfully shared with an unknown number of entities.

249.    Ms. Finch possesses and asserts each of the claims she asserts on behalf of the proposed Class.

250.    Ms. Finch seeks similar relief as other Class Members.

### d.    Adequacy of Representation

251.    Ms. Finch is an adequate class representative.

252.    Ms. Finch's interests are coextensive with those of the Members of the proposed Class. Ms. Finch is willing and able to represent the proposed Class fairly and vigorously as she pursues her similar individual claims in this action.

253.    Ms. Finch will fairly and adequately protect the interests of the Class because she has no interests antagonistic to, or in conflict with, the Class that Ms. Finch seeks to represent.

254.    Ms. Finch has retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate a class action of this size and complexity.

### e.    Predominance & Superiority

255.    A class action is superior to other available means for the fair and efficient adjudication of this controversy.

256.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly where individual Class

Members lack the financial resources to vigorously prosecute a lawsuit against a large corporation such as Xandr.

257.   Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

258.   The prosecution of separate actions by individual Members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual Members of the Class, establishing incompatible standards of conduct for Xandr and resulting in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties.

259.   The issues in this class action can be decided by means of common, class-wide proof. In addition, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

260.   Xandr has acted on grounds generally applicable to Plaintiff and the proposed Class by adopting and following systematic policies, practices, and procedures that unlawfully gather and transmit personal data.

261.   Xandr has acted or refused to act on grounds generally applicable to Ms. Finch and Class Members by failing to obtain proper consent or failure to have a legitimate interest.

262.   Xandr's systematic conduct justifies the requested injunctive and declaratory relief with respect to the Class as a whole.

**f.    Injunctive/Declaratory Relief**

263.   Injunctive, declaratory, and affirmative relief are a predominate form of relief sought in this case. Entitlement to declaratory, injunctive, and affirmative relief flows directly and automatically from proof of Xandr's refusal to comply with the UK GDPR. In turn, entitlement to declaratory, injunctive, and affirmative relief

forms the factual and legal predicate for the monetary and non-monetary remedies for losses caused by Xandr's systemic unlawful use of personal data.

    **C.**    **Requirements of Rule 23(c)(4) Issue Certification**

264.    Additionally, or in the alternative, the Court may grant "partial" or "issue" certification under Rule 23(c)(4). Resolution of common questions of fact and law would materially advance the litigation for all Class Members.

**FIRST CLAIM FOR RELIEF**

**Violation of the UK GDPR**

265.    Ms. Finch re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

266.    Xandr's conduct, as described herein, was and is in violation of the UK GDPR.

267.    Ms. Finch and Class Members are "data subjects," as defined in Article 4(1) of the UK GDPR.

268.    Ms. Finch and Class Members behavior discussed herein took place within the UK.

269.    Xandr is a "controller," as defined in Article 4(7) of the UK GDPR.

270.    Xandr is established outside of the United Kingdom.

271.    Although Xandr is a data controller not established in the United Kingdom, the data processing activities complained of herein are related to the monitoring of data subjects' behavior within the United Kingdom and, as such, pursuant to Article 3(2)(b), it is subject to the UK GDPR.

272.    Xandr created and placed unique cookie IDs and used those unique identifiers to collect and monitor Ms. Finch and Class Members browser generated information (BGI).

273.    The uniquely identifying cookie IDs and associated BGI are "personal data," as defined in Article 4(1) of the UK GDPR.

274.    In processing Ms. Finch and the Class Members' personal data, Xandr must act lawfully, fairly, and in a transparent manner.

275.    Xandr's conduct violates the UK GDPR in at least the following ways:

    a.    Xandr does not process the personal data of data subjects, including Ms. Finch and Class Members, lawfully, as it fails to have a legal basis for its processing. Xandr fails to obtain valid consent and fails to show that it has a legitimate business interest.

    b.    By creating and sharing the unique cookie ID and other BGI with other data controllers (who use the personal data for profiling and targeting), Xandr has processed the personal data of data subjects, including Ms. Finch and Class Members, without a lawful basis and without meeting the requirement for transparency in processing.

    c.    Xandr violates the transparency principle as data subjects, including Ms. Finch and Class Members, do not know and seldom can discover what data is held on them, where that data is held, to whom it is transferred, and how it is processed.

    d.    Xandr breaches the principle of transparency because it provides no information to data subjects, including Ms. Finch and Class Members, regarding what personal data is being processed and because the onward transmission of data, including to whom the data is passed, is not disclosed.

    e.    Xandr's failure to name the recipients of the personal data is a breach of transparency in processing.

    f.    Xandr's scope of processing and use of personal data of the data subjects, including Ms. Finch and Class Members, far exceeds

what is specified to the data subjects at the point where the personal data is collected or produced.

d.  Xandr's actions, including cookie syncing and its sharing of data subjects' personal data without proper monitoring, are done in such a way that Xandr is prevented from appropriately protecting and ensuring confidentiality and security of the personal data of data subjects, including Ms. Finch and Class Members.

e.  Xandr fails to satisfy Articles 13-14, as it does not provide all of the required information to data subjects, including Ms. Finch and Class Members.

f.  Xandr's processing of personal data via the creation of unique cookie IDs and the collection of associated BGI constitutes intrusive, extensive, and unexpected loss of control of personal data.

276.  The conduct herein has caused injury to Ms. Finch and the Class Members in the form of loss of control of their personal data and invasion of privacy.

277.  As the controller involved in processing personal data, Xandr is liable for the damage caused by its processing which violates the UK GDPR.

278.  Xandr's actions alleged herein caused Ms. Finch and the Class Members to have their personal data shared with unknown sources without adequate consent or a legitimate business interest, thereby causing injury.

279.  Accordingly, Ms. Finch and the Class Members have suffered injury in fact, including the loss of personal data and privacy, as a result of Xandr's lack of a lawful basis for processing and lack of transparency for which compensation should be awarded under Article 82 of the UK GDPR.

280.  Ms. Finch seeks to enjoin further unlawful acts or practices by Xandr.

281.    Ms. Finch requests that this Court enter such orders or judgments as may be necessary to enjoin Xandr from continuing its unlawful practices and to compensate Ms. Finch and the Class Members for the injuries each sustained, as provided in Article 82 of the UK GDPR, and for such other relief set forth below, including but not limited to Plaintiff's attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Finch and the Class request that the Court enter an order granting the following relief:

1.    That the Court certify the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.    That the Court name Ms. Finch as Class Representative and her counsel as Class Counsel;

3.    That Ms. Finch and the Class have and recover injunctive relief as appropriate;

4.    That Ms. Finch and the Class have and recover from Xandr damages for Xandr's violation of the UK GDPR;

5.    That the Court award attorneys' fees to Ms. Finch and any other applicable law;

6.    That the Court award Ms. Finch and the Class pre-judgment and post-judgment interest at the highest legal rate provided by law;

7.    That all costs of this action be taxed against Xandr; and

8.    That the Court award Ms. Finch and the Class such other and further relief as this Court may deem just and proper.

9.    PLAINTIFF DEMANDS A TRIAL BY JURY.

This the 12th day of July, 2021.

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN LLC**


BY:    */s/ Andrei Rado*
       100 Garden City Plz., Ste. 500
       Garden City, NY 11530
       Phone: (212) 594-5300
       Fax: (212) 868-1229
       arado@milberg.com

       Daniel Bryson*
       Andrew Hathaway *
       900 W. Morgan Street
       Raleigh, NC 27603
       Telephone: (919) 600-5000
       Facsimile: (919) 600-5035
       dbryson@milberg.com
       dhathaway@milberg.com

       Greg Coleman*
       First Tennessee Plaza
       800 S. Gay Street, Suite 1100
       Knoxville, TN 37929
       T: 865-247-0080
       F: 865-522-0049
       gcoleman@milberg.com

       Caroline Ramsey Taylor*
       518 Monroe Street
       Nashville, TN 37208
       (615) 921-6500 (phone)
       (615) 921-6501 (fax)
       ctaylor@milberg.com

       *Pro Hac Vice Application Forthcoming*
       *Counsel for Plaintiff*